413 A.2d 58.

STATE *vs.* IDALIO SANTOS.

MARCH 20, 1980.

PRESENT: Bevilacqua, C.J., Kelleher, Doris and Weisberger, JJ.

802

Doris, J.    This is an appeal from a Superior Court judgment of conviction wherein Idalio Santos (defendant), was adjudged guilty of transporting for immoral purposes and of committing an abominable and detestable crime against nature. The defendant now claims that the trial justice deprived him of his right to a public trial, admitted into evidence the fruits of an illegal search and seizure, improperly sustained his own objections to questions asked by defense counsel, and erroneously admitted into evidence hearsay statements concerning the defendant's prior bad acts. Additionally, the defendant challenges the constitutionality of the statutes under which he was convicted, alleging that they are vague and infringe upon his right of privacy. We reject the defendant's arguments and affirm the judgment of the Superior Court.

On December 30, 1977, the complainant went to the Rustic Pub in Swansea, Massachusetts, to meet her sister and some friends. While there, she met defendant, with whom she talked and danced from about 10 p.m. to 1 a.m. when the establishment closed. The complainant extended, and defendant accepted, an invitation to accompany her to a New Year's Eve party to be held at her sister's home the following evening. Before leaving the Rustic Pub, she and defendant agreed to meet for coffee at a nearby Howard Johnson's restaurant in Swansea. The complainant parked her car in the front lot of the restaurant and defendant parked his car in the larger lot behind the building. While at the restaurant, they discussed the party, exchanged phone numbers and addresses, and then left at approximately 1:30 a.m.

As they left the building, they walked to the rear parking lot. The complainant testified that after they had reached defendant's car and had said goodnight, defendant grabbed her and refused to let her go. In response to her efforts to loosen his grasp, defendant told her to be quiet and to avoid a scene. The defendant further told the complainant that he did not care if he was hurting her and that he had a knife which he would use if he had to. The defendant then ordered her to get into his car. The complainant, though she never saw the knife, testified that she entered the car because she was afraid defendant would hurt her.

The defendant entered the car immediately after the complainant, and they drove to a secluded area in Bristol, Rhode Island. The defendant then ordered her to get into the rear seat of the car where he first had sexual intercourse and then anal intercourse with her. The complainant testified that she was too afraid to resist defendant other than by unsuccessfully attempting to push him away.

At approximately 4 a.m., both parties dressed and they returned to the Howard Johnson's parking lot. The complainant testified that as they left Bristol, defendant asked her whether she intended to complain that he had raped her be-

cause two other women had previously done so. She further testified that when they arrived at the restaurant parking lot, defendant again asked whether she would say she had been raped or had willingly had sex.[1] The complainant then left defendant's car and, after resting in her car for a short time, drove to her home in Somerset, Massachusetts. Later that morning she called the Swansea Police Department and, after talking with a police officer, went to a hospital for an examination. The following day the complainant met with members of the Rhode Island State Police and showed them the location in Bristol where defendant had taken her.

On January 1, 1978, members from the police departments of Fall River and Somerset, Massachusetts, went to defendant's apartment in Fall River and arrested him. The defendant told the arresting officers that the complainant had consented to everything they had done together. He further said that he could not understand why women let him make love to them and then accused him of rape, and that this was the third time he had been so accused. On January 2, 1978 the police searched defendant's car, which they had previously seized, at the Somerset Police Department and discovered a knife in the glove compartment.

The defendant was subsequently tried in the Superior Court on four counts: rape, the abominable and detestable crime against nature, kidnapping, and transporting for immoral purposes. After calling the complainant as its first witness, the state moved to clear the courtroom of all spectators during her testimony. Counsel for defendant objected, arguing that the complainant was not of tender years and therefore should testify in open court. The trial justice, however, ordered the courtroom cleared of all spectators, stating that the exclusion did not deprive defendant of his right to a public trial. The trial justice, relying on the opening statement of counsel and the facts to be elicited during the complainant's testimony, held that it would be in the best inter-

---

[1]The trial justice cautioned the jurors that they could use the testimony only as evidence that defendant had spoken to her while they were in the car.

ests of all parties to exclude the spectators from the courtroom.

The complainant then testified, identifying defendant as her assailant and relating what had transpired on the evening of December 30, 1977. After the complainant repeated defendant's statement that two other women had previously accused him of rape, the trial justice instructed the jury that he had admitted the testimony only to show that the conversation occurred and that the jurors should not consider her testimony as evidence that other rapes had actually happened. Similarly, after the police officers testified that defendant had told them that this was the third time women had claimed that he raped them, the trial justice instructed the jury that they could consider the testimony only as evidence of defendant's state of mind.

At the conclusion of the trial, defense counsel requested instructions that consent could be raised as a defense to the abominable and detestable crime against nature. The trial justice instructed the jury that consent was not relevant either to that charge or to the transporting charge. The jury then returned its verdict, acquitting defendant of the rape and kidnapping charges and convicting him of transporting for immoral purposes and committing an abominable and detestable crime against nature. From these judgments of conviction defendant now appeals.

The defendant first claims that the exclusion of all spectators from the courtroom during the testimony of the complainant deprived him of his right to a public trial. Although the right to a public trial is fundamental, it is not a "limitless imperative" of a criminal defendant. *United States ex rel. Smallwood* v. *LaValle*, 377 F. Supp. 1148, 1151 (E.D.N.Y. 1974). As we have previously noted, the right is subject to "a court's inherent power to regulate admission to the courtroom and to restrict attendance at the trial as conditions and circumstances may reasonably demand in order to preserve order and decorum, or to protect the rights of the parties and the witnesses, or generally to further the administration of

justice." *State* v. *Mancini,* 108 R.I. 261, 271-72, 274 A.2d 742, 747 (1971). A trial justice thus had the discretion to exclude spectators from the courtroom in certain circumstances, including when necessary to protect a witness from the embarrassment or emotional pressures that often result when a victim must relate the details of a lurid crime in open court. *United States ex rel. Orlando* v. *Fay,* 350 F.2d 967, 971 (2d Cir. 1965); *United States ex rel. Smallwood* v. *LaValle,* 377 F. Supp. 1148, 1151 (E.D.N.Y. 1974); *People* v. *Jelke,* 308 N.Y. 56, 63, 123 N.E.2d 769, 772 (1954); *Commonwealth* v. *Knight,* 469 Pa. 57, 66-68, 364 A.2d 902, 906 (1976).

When fashioning an exclusion order to alleviate a witness' embarrassment or emotional trauma, a trial justice has more latitude than if he were closing the courtroom for another reason. Accordingly, if necessary the trial justice may exclude some or all spectators during the witness' testimony. *United States ex rel. Smallwood* v. *LaValle,* 377 F. Supp. at 1151; *Commonwealth* v. *Knight,* 469 Pa. at 68, 364 A.2d at 908. The trial justice remains obliged, however, to strike an acceptable balance between the accused's right to a public trial and the need to protect the witness, paying particular attention that neither the scope nor the duration of the order violates the rights of an accused. *Commonwealth* v. *Knight,* 469 Pa. at 66, 364 A.2d at 906. The duration of the order is an especially important factor. *United States ex rel. Smallwood* v. *LaValle,* 377 F. Supp. at 1151; *Butler* v. *Smith,* 416 F. Supp. 1151, 1154 (S.D.N.Y. 1976). If the exclusion order is necessary and the trial justice has limited its duration to that minimally required to protect the testifying witness, there is no denial of a public trial, even if the court excludes all spectators. The temporary exclusion of all spectators is permissible when, as here, a witness must testify to the details of a sexual assault. Because the trial justice limited the exclusion order to the testimony of the victim, it did not, as defendant Santos claims, totally deprive him of his right to a public trial.

The defendant also contends that the trial justice lacked sufficient reason to close the courtroom because the witness had exhibited no signs of emotional disturbance while on the stand. Whether an exclusion order is warranted depends on the circumstances presented in each case. *Commonwealth v. Knight*, 469 Pa. at 66, 364 A.2d at 906. The need to close the courtroom will often be acute when, because the witness is young, emotionally upset, or the victim of a sex crime, he cannot bring himself to testify in open court. *Commonwealth v. Stevens*, 237 Pa. Super. Ct. 457, 352 A.2d 509 (1975); 3 Wharton, *Criminal Procedure* §439 at 222-25 (12th ed. 1975). Because of the concern for the defendant's right to a public trial, the trial justice should exercise his power sparingly and should exclude the public only when necessary to enable the witness to testify fully and accurately. *United States ex rel. Smallwood v. LaValle*, 377 F. Supp. at 1152. The trial justice need not, however, wait until the witness breaks down on the stand before issuing an exclusion order. Such a requirement would unnecessarily subject the witness to the sort of emotional trauma that the exclusion of spectators is intended to avoid. *Commonwealth v. Knight*, 469 Pa. at 67, 364 A.2d at 907. A trial justice may properly order the public from the courtroom if, in light of the nature of the crime, the expected testimony, or the emotional state of the witness, he has determined that the testimony would likely be severely hampered or distorted if the witness were required to testify in public. *See Commonwealth v. Stevens*, 237 Pa. Super. Ct. at 468, 352 A.2d at 515 (not unreasonable for trial court to find testimony hampered if courtroom not cleared).

Here, the trial justice issued the exclusion order on the basis of the opening statements of counsel and the nature of the testimony to be elicited from the complainant. The justice ruled that it would be in the best interest of all parties to close the courtroom during the young woman's testimony. The age and experience of the witness, though important factors in deciding whether to exclude the public, are not controlling. *Commonwealth v. Stevens*, 237 Pa. Super. Ct. at

467-68, 352 A.2d at 514-15. Accordingly though the complainant was twenty-two years old at the time of trial, the trial justice was not precluded from finding that she would be subject to the same sort of emotional stress while testifying as would hinder the testimony of a younger witness. In light of the lurid nature of the crimes about which the complainant testified, it was reasonable for the trial justice to conclude that she would be able to relate her testimony to the jurors only in the absence of court spectators. We therefore find that the trial justice acted properly in closing the courtroom for the limited purpose of ensuring that the complainant would testify as accurately and under as little emotional stress as was possible.

The defendant also challenges the unconstitutionality of the statutes under which he was convicted, G.L. 1956 (1969 Reenactment) §§11-10-1 and 11-34-5, arguing that they are impermissibly vague and deprive him of his constitutional right of privacy. As a corollary of this argument, defendant urges this court to recognize a right of privacy that would prevent the state from making criminal the private sexual relations between consenting adults. We decline to do so.

The constitutional requirement that criminal statutes be precisely drawn prevents a state from prosecuting anyone under a penal statute that does not give a person of ordinary intelligence fair notice that his conduct is unlawful. *United States* v. *Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 812, 98 L. Ed. 989, 996 (1954); *State* v. *Levitt*, 118 R.I. 32, 36, 371 A.2d 596, 598 (1977). The rationale for this requirement is that no one may "be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States* v. *Harriss*, 347 U.S. at 617, 74 S. Ct. at 812, 98 L. Ed. at 996. As this court has recently noted, however, the language of a statute challenged on vagueness grounds must be interpreted in light of its "common law meaning, its statutory history and prior judicial interpretations of its particular terms." *State* v. *Levitt*, 118 R.I. at 36, 371 A.2d at 598; *see Wainwright* v. *Stone*, 414 U.S. 21, 22-23, 94 S. Ct. 190, 192, 38 L. Ed. 2d 179, 182 (1973) (per curiam) (claims of vague-

ness must be judged in light of judicial interpretations of statute). We need look no further than our previous opinions to resolve defendant's vagueness argument.

This court has previously had the opportunity to examine §§11-10-1 and 11-34-5 and has upheld each statute against a vagueness challenge. In *State* v. *Milne*, 95 R.I. 315, 187 A.2d 136 (1962), a defendant convicted of receiving a person into his room for the purpose of performing fellatio, alleged that §11-34-5, by virtue of its vague and indefinite description of the proscribed conduct, deprived him of his right to due process under both the state and federal constitutions. Prior to resolving the vagueness issue, the *Milne* court discussed the legislative purpose in enacting Title 11 and found that its provisions evinced an intent "to proscribe all natural copulation that takes place outside of the marriage status." *Id.* at 321, 187 A.2d at 139. Interpreting §11-10-1 in this light, the court found that it necessarily proscribed all unnatural sexual copulation. *Id.*, 187 A.2d at 139. The court rejected the argument that had the Legislature intended to make fellatio unlawful, it would have done so explicitly in §11-10-1. Instead, the court presumed that the Legislature had eschewed a statutory enumeration so as not to limit the statute to the matters enumerated. *Id.*, 187 A.2d at 140. The court reasoned that the Legislature had purposely chosen the term "crime against nature" to achieve a degree of comprehensiveness that would not have been possible with an enumeration. The court then held that fellatio was criminal under §11-10-1 and, accordingly, was an indecent act within the meaning of §11-34-5. *Id.* at 322, 187 A.2d at 140.

The court employed similar reasoning in holding that the term "indecent act," as used in §11-34-5, possessed the degree of certainty required by the constitution. Emphasizing the impracticability of establishing "rigid legislative criteria" when dealing with sex crimes, the court states that a reasonable certainty in regard to the conduct proscribed was all that the statute need provide. The court noted the near impossibility of describing all means by which one could vio-

late §11-34-5 and concluded that when the statutory language "is as specific as the subject matter reasonably permits, the constitutional requirement is satisfied." *State* v. *Milne*, 95 R.I. at 323, 187 A.2d at 140.

As it had done in construing §11-10-1, the court reasoned that the Legislature, by using the language "indecent act" had intended to give the statute a broad meaning and "to avoid the exclusory effect" that might have resulted had it attempted to enumerate the acts proscribed. *Id.* at 323-24, 187 A.2d at 141. So construing §11-34-5, the court held that it was intended to bar all unlawful sexual conduct, whether natural or unnatural, including the act of fellatio. Accordingly, the term "indecent act" was sufficiently specific to satisfy the constitutional requirement of definiteness for criminal statutes. *Id.* at 324, 187 A.2d at 141.

This court again considered the meaning of §11-10-1 in *State* v. *Levitt*, 118 R.I. 32, 371 A.2d 596 (1977), wherein a defendant charged with forcing a woman to perform fellatio on him argued that the term "abominable and detestable crime against nature" was impermissibly vague. In examining the interpretive case law, we found *State* v. *Milne*, 95 R.I. 315, 187 A.2d 136 (1962), dispositive and therefore placed no merit in that defendant's vagueness claim. We held that the statute as construed provided fair notice to defendant that his conduct was unlawful. *State* v. *Levitt*, 118 R.I. at 36, 371 A.2d at 598-99.

Viewing both §§11-10-1 and 11-34-5 in light of *Milne* and *Levitt*, as we are required to do, we see no reason to find either statute unconstitutionally vague as applied to defendant Santos. In construing §11-10-1 in *Levitt*, we found *Milne* dispositive of the vagueness claim because it "provided specificity to what otherwise might [have been] considered an ambiguous criminal statute, [and] fixed its meaning for subsequent cases * * *." *State* v. *Levitt*, 118 R.I. at 36, 371 A.2d at 598. Although *Milne* concerned a prosecution for an act of fellatio, our construction of §11-10-1 was not, as defendant argues, limited to the inclusion of that act within

the terms of the statute. As we clearly stated in *Milne*, the legislative intent in enacting §11-10-1 was to proscribe "all unnatural sexual copulation." *State* v. *Milne*, 95 R.I. at 321, 187 A.2d at 139. The act of anal intercourse for which defendant Santos was convicted, being an act of "unnatural sexual copulation," was clearly proscribed by §11-10-1, as construed by *Milne*. Santos, therefore, may not complain that the statute did not provide fair warning that his conduct was proscribed. *See Wainwright* v. *Stone*, 414 U.S. 21, 22-23, 94 S. Ct. 190, 192, 38 L. Ed. 2d 179, 182 (1973); *State* v. *Levitt*, 118 R.I. at 36-37, 371 A.2d at 598-99 (statute read in light of prior judicial interpretations).

In *Milne*, we held that the term "indecent act," as used in §11-34-5, was sufficiently definite to satisfy the constitutional requirement of certainty. The defendant Santos was convicted under another part of this statute which made it unlawful to transport a person for the purpose of any "lewd or indecent act."[2] Although *Milne* did not construe the part of the statute now before us, the language in each part is nearly identical; and there is no reason for us to construe "lewd or indecent act" any differently than we construed the term "indecent act" in *Milne*. For the reasons stated in *Milne*, therefore, defendant's vagueness claim regarding §11-34-5 is without merit.

The defendant further asserts that §§11-10-1 and 11-34-5 are unconstitutional because they violate his right of privacy under the state and federal constitutions. Neither party has briefed the issue of defendant's standing to raise this argument. In order to reach the merits of the privacy claim, we shall assume, without deciding, that defendant has standing.

There is no right of privacy explicitly mentioned in either the Rhode Island or the federal constitution. The Supreme Court of the United States, however, has recognized a right

---

[2]General Laws 1956 (1969 Reenactment) §11-34-5 provides in part:

"It shall be unlawful for any person to * * * transport * * * another for the purpose of prostitution, or for any other lewd or indecent act; * * *."

of personal privacy derived from certain guarantees of the Bill of Rights. Though the Supreme Court has yet to establish definitively the extent of this right, it is clear that the right of privacy insulates certain fundamental personal decisions from government interference.

To date, the Supreme Court has dealt with the right of privacy primarily in the context of personal decisions regarding contraception and abortion. The court first enunciated the constitutional right of privacy in *Griswold* v. *Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), wherein the Court invalidated a statute proscribing the use of contraceptives.[3] The *Griswold* Court reasoned that penumbras emanating from the specific guarantees of the Bill of Rights gave those guarantees life and substance and created a zone of privacy that protects the individual from governmental interference. Stating that the marital relationship was within the zone of privacy and that the enforcement of the statute would be "repulsive to the notions of privacy surrounding the marriage relationship," the Court held the statute unconstitutional. *Griswold* v. *Connecticut*, 381 U.S. at 485-86, 85 S. Ct. at 1682, 14 L. Ed. 2d at 515-16.

The Court has since established that the right of privacy is not confined solely to the marital relationship. *Eisenstadt* v. *Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972). The *Eisenstadt* Court upheld a District Court order issuing a writ of habeas corpus to a person convicted under a Massachusetts statute prohibiting the unlicensed distribution of contraceptives.[4] Viewing the statute as a prohibition of contraception *per se*, the Court found that it violated the rights of unmarried persons under the equal protection clause of the

---

[3]The challenged statute provided:

"Any person who uses any drug, medicinal article or instrument for the purpose of preventing conception shall be fined not less than fifty dollars or imprisoned not less than sixty days nor more than one year or be both fined and imprisoned." Conn. Gen. Stat. Ann. §53-32 (West 1960) (repealed 1969 Conn. Pub. Acts 828 §214).

[4]Massachusetts General Laws Ann. ch. 272 §21A (West 1970).

Fourteenth Amendment. The Court reasoned that the right of access to contraceptives, whatever right it may be, must be the same for married and unmarried persons alike.

Although resting its decision on equal protection grounds, the Court also explicated the right of privacy, stating that the right was not confined to the marital relationship. Acknowledging that in *Griswold* the right to privacy had inhered in the marital relationship, the Court reasoned that the marital couple was not simply an independent entity but an association of separate individuals. Elaborating, the Court stated that "[i]f the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt* v. *Baird*, 405 U.S. at 453, 92 S. Ct. at 1038, 81 L. Ed. 2d at 362.

The Supreme Court has subsequently made clear that the right of privacy is not so inclusive as the language in *Eisenstadt* might make it appear. In *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), the Court considered whether a Texas criminal statute that permitted abortions only when necessary to save the life of the mother infringed the right of privacy.[5] Summarizing its prior decisions, the Court stated "that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' * * * are included in this guarantee of personal privacy." *Roe* v. *Wade*, 410 U.S. at 152, 93 S. Ct. at 726, 35 L. Ed. 2d at 176 (quoting *Palko* v. *Connecticut*, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937). The Court further stated that its prior opinions had established that the right of privacy applied to activities concerning marriage, procreation, contraception, family relationships and child rearing and education. *Id.* at 152, 93 S. Ct. at 726, 35 L. Ed. 2d at 176-77.[6]

---

[5]Texas Penal Code Ann. arts. 1191-1194, 1196 (Vernon 1961).

[6]Expressing its belief that the basis of the right to privacy was the "concept of personal liberty and restrictions upon state action" that inhere in the Fourteenth Amendment, the Court held that the right was sufficiently broad to include a woman's decision whether or not to have an abortion. *Roe* v. *Wade*, 410 U.S. 113, 153, 93 S. Ct. 705, 727, 35 L. Ed. 2d 147, 177 (1973).

In a recent opinion, the Supreme Court ruled unconstitutional on privacy grounds a New York statute making criminal the unauthorized sale or distribution of contraceptives.[7] In *Carey* v. *Population Services International,* 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977), the Court reiterated its earlier statements that one aspect of the liberty protected by the due process clause of the Fourteenth Amendment is a right of personal privacy which includes an interest in independence in making certain kinds of important decisions. *Id.* at 684, 97 S. Ct. at 2016, 52 L. Ed. 2d at 684 (quoting *Whalen* v. *Roe,* 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977)). The Court stated that although the outer limits of the protection afforded to individual decision making were not yet defined, decisions relating to marriage, contraception, procreation, and family relationships clearly were protected. In striking down the statute, the Court considered only the individual's decision whether or not to have a child, characterizing it as "among the most private and sensitive" that a person could make. The *Carey* Court reserved judgment on whether, and the extent to which, a state could regulate private consensual sexual relations between adults. *Id.* at 688 n.5, 694 n.17, 97 S. Ct. at 2018 n.5, 2021 n.17, 52 L. Ed. 2d at 687 n.5, 691 n.17.

The language in *Eisenstadt* forbidding unwarranted governmental interference in matters as fundamental as the decision to have a child suggests that unmarried adults may be entitled to similar protection in their decision about whether to engage in private consensual sexual conduct. Indeed, a few state courts have expanded the right of privacy to encompass private consensual sexual relations between adults. *State* v. *Pilcher,* 242 N.W.2d 348 (Iowa 1976) (sodomy statute unconstitutional on privacy grounds as applied to consenting adults of opposite sex); *State* v. *Saunders,* 75 N.J. 200, 214, 381 A.2d 333, 339-40 (1977) (fornication statute infringes right of privacy). *But see State* v. *Callaway,* 25 Ariz. App. 267, 542 P.2d 1147 (1975) (right of sexual privacy between consenting

---

[7]New York Educ. Law §6811(8) (McKinney 1972).

adults fundamental), *rev'd sub nom. State* v. *Bateman,* 113 Ariz. 107, 547 P.2d 6, *cert. denied,* 429 U.S. 864, 97 S. Ct. 170, 50 L. Ed. 2d 143 (1976); *State* v. *Elliot,* 88 N.M. 187, 539 P.2d 207 (Ct. App. 1975) (application of sodomy statute to private consensual acts between adults unconstitutional), *rev'd,* 89 N.M. 305, 551 P.2d 1352 (1976); *In re P.,* 92 Misc. 2d 62, 76, 400 N.Y.S.2d 455, 465 (Fam. Ct. 1977) (right of privacy protects "private, intimate consensual sexual conduct not harmful to others"), *rev'd sub nom. In re Dora P.,* 68 App. Div. 2d 719, 418 N.Y.S.2d 597 (1979).

If read alone, the language of *Eisenstadt* is susceptible of such an interpretation. We believe, however, that the parameters of the right of privacy can be better ascertained by viewing *Griswold* and its progeny collectively. In doing so, we find that the right of privacy is closely related to the decision whether or not to have a child. Though the *Eisenstadt* Court broadly construed the right of privacy, the *Roe* Court subsequently employed a narrower construction. In *Roe,* the Court stated that only those personal rights that are " 'fundamental' " or " 'implicit in the concept of ordered liberty' " are protected by the right of privacy. *Roe* v. *Wade,* 410 U.S. at 152, 93 S. Ct. at 726, 35 L. Ed. 2d at 176 (quoting *Palko* v. *Connecticut,* 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937)). The *Roe* Court included within the concept of privacy, activities that relate to marriage, procreation, contraception, and family relationships. *Id.* at 152, 93 S. Ct. at 726-27, 35 L. Ed. 2d at 176-77. The claimed right of an adult to engage in any sort of private consensual sexual conduct related to none of these matters. Although such acts may be conducted in the utmost privacy, they are not for that reason alone entitled to the degree of protection the right of privacy confers on decisions regarding the use of contraceptives or the termination of a pregnancy. The latter decisions are inextricably linked to "the decision whether to bear or beget a child," *Eisenstadt* v. *Baird,* 405 U.S. at 453, 92 S. Ct. at 1038, 31 L. Ed. 2d at 362, and it is this decision that underlies the holdings of the Supreme Court in *Griswold, Eisenstadt,* and *Roe. Carey* v. *Population Services Inter-*

*national,* 431 U.S. at 688-89, 97 S. Ct. at 2018, 52 L. Ed. 2d at 687. Notwithstanding the opinions of some state courts to the contrary, we do not believe that the decision of an unmarried adult to engage in private consensual sexual activities is of such a fundamental nature or is so " 'implicit in the concept of ordered liberty' " to warrant its inclusion in the guarantee of personal privacy. *Roe* v. *Wade,* 410 U.S. at 152, 93 S. Ct. at 726, 35 L. Ed. 2d at 176 (quoting *Palko* v. *Connecticut,* 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937)). In rejecting defendant Santos' claim that G.L. 1956 (1969 Reenactment) §§11-10-1 and 11-34-5 infringe his right of privacy, we find persuasive the recent decisions in which the Supreme Court has declined to give the right a more expansive reading.

In *Carey* the Court reiterated what it had said in *Roe,* stating that *Griswold* and its progeny had established that "the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State." 431 U.S. at 687, 97 S. Ct. at 2017, 52 L. Ed. 2d at 686. Although the question whether the right of privacy protects the private consensual sexual conduct of adults had been raised in *Carey,* the Court found it unnecessary to reach that issue. *Id.* at 694 n.17, 97 S. Ct. at 2021 n.17, 52 L. Ed. 2d at 691 n.17. Instead, the Court emphasized the interrelationship between the right of privacy and the "right of decision in matters of childbearing" in striking down the statute. *Id.* at 688-89, 97 S. Ct. at 2018, 52 L. Ed. 2d at 687.

In a decision prior to *Carey,* the Supreme Court declined to extend the right of privacy to sexual matters not related to childbearing. The Court summarily affirmed a District Court judgment that upheld a Virginia sodomy statute against a privacy challenge. *Doe* v. *Commonwealth's Attorney,* 425 U.S. 901, 96 S. Ct. 1489, 47 L. Ed. 2d 751 (1976). In *Doe,* the District Court essentially had viewed the right of privacy as incident to the marital relationship. *Doe* v. *Commonwealth's Attorney,* 403 F. Supp. 1199, 1200-02 (E.D. Va. 1975). Accordingly, that court had held that private consensual homosexual conduct between adults was not

protected by the right of privacy and could be prosecuted under the sodomy statute. *Id.* at 1201-02.[8]

In light of the *Doe* Court's affirmance of the determination that the right of privacy excluded private consensual homosexual conduct and the *Carey* Court's emphasis of the interrelationship between the right of privacy and matters relating to childbearing, we hold that the right of privacy is inapplicable to the private unnatural copulation between unmarried adults.

During the course of the trial, the trial justice on his own motion occasionally excluded questions asked of the witnesses. The defendant Santos now argues that by excluding questions not objected to, the trial justice took the role of an advocate and failed to maintain the appearance of impartiality. For the reasons stated below, we find this claim without merit.

It is the responsibility of the trial justice to ensure that the parties properly present the case so that the truth may be ascertained. The quest for truth requires that the evidence adduced before the jury be free of "irrelevant considerations and appeals to prejudice and emotion" that might otherwise divert the jury from the real issues of the case. *Commonwealth* v. *Haley,* 363 Mass. 513, 518, 296 N.E.2d 207, 211 (1973) (quoting Lummus, *The Trial Judge,* 19-21 (1937)). Thus, a trial justice may exclude objectionable evidence on his own motion without awaiting a formal objection. *People* v. *Martin,* 24 Ill. App. 3d 710, 716, 321 N.E.2d 368, 373 (1974); *State* v. *Thornburgh,* 220 N.W.2d 579, 584 (Iowa 1974); *Commonwealth* v. *Haley,* 363 Mass. at 518, 296 N.E.2d at 210-11; McCormick, *Evidence* §55 at 129 (2d ed. 1972); 1 Wigmore, *Evidence* §18 at 321 (3d ed. 1940). The record indicates that the trial justice did precisely this; the justice clearly explained to counsel that he intended to ex-

---

[8]The Supreme Court's decision in *Doe,* though a summary affirmance, is a disposition of the case on the merits; and the result, though not the District Court's reasoning, is thus binding on the lower courts. *Hicks* v. *Miranda,* 422 U.S. 332, 343-44, 95 S. Ct. 2281, 2289, 45 L. Ed. 2d 223, 236 (1975).

clude any extraneous or unreasonable questions in order to limit the inquiry to those matters that were material and relevant to the case.

By excluding objectionable questions in this manner, the trial justice did not, as defendant argues, sacrifice his impartiality. On the contrary, the justice acted quite even-handedly, excluding questions asked by the prosecutor as well as those asked by defense counsel. There is nothing in the record to show that the trial justice advocated the position of one party over the other, nor did his conduct evince any bias or belief regarding the credibility of the witnesses. *See State* v. *Lint,* 361 A.2d 926, 927 (Me. 1976) (per curiam) (trial justice not impartial when his questions indicate witness not believable); *Commonwealth* v. *Lanza,* 228 Pa. Super. Ct. 300, 303, 323 A.2d 178, 179 (1974) (trial justice may not show bias or belief in credibility of witness). Additionally, the trial justice instructed the jurors that they should decide the case only on the basis of the evidence, and that his rulings did not reflect his opinion on the issues of the case and should not be considered by them in determining defendant's guilt. In light of all this, we find that the trial justice acted properly in excluding the questions on his own motion and maintained the requisite impartiality while doing so.

The defendant further argues that the trial justice erred in admitting into evidence a knife obtained during an allegedly illegal search and seizure of his car. We need not reach the merits of defendant's Fourth Amendment arguments because the evidence discovered was not relevant to the crimes for which defendant was convicted.

The gist of defendant's argument is that the trial justice should have suppressed the knife discovered during the unlawful search of his car. The knife increased the likelihood that defendant had threatened the complainant with physical harm and was therefore relevant to the rape and kidnapping charges - crimes that involve a question of force or compulsion. The jury, however, acquitted defendant of these charges. The knife was not relevant to defendant's conviction

for committing an abominable and detestable crime against nature or for transporting for immoral purposes. The test of relevancy is whether the offered evidence has any tendency to make the existence of the fact sought to be proven more probable or less probable than it would have been without the evidence. *Capezza* v. *Hertz Equipment Rental Corp.*, 118 R.I. 1, 6-7, 371 A.2d 269, 272 (1977); McCormick, *Evidence* §185 at 437 (2d ed. 1972); 1 Weinstein's *Evidence*, ¶ 401[07] at 401-27 (1979). The admission of the knife into evidence did not affect the probability that defendant committed either crime, and therefore is not relevant to the convictions now before us. If the admission of the knife is not relevant to defendant's convictions, it follows that the means by which it was obtained also are not relevant.

We now consider whether the trial justice erred in admitting defendant's allegedly hearsay statements into evidence. At trial, the complainant and two police officers testified that defendant had told them that on two other occasions women had accused him of rape. The trial justice cautioned the jurors that they could use the complainant's testimony only as evidence that defendant had spoken to her. The justice further instructed the jurors that defendant's statements to the police officers were admissible only to show his state of mind.

An extrajudicial statement offered to prove the truth of the matter asserted in the statement is hearsay evidence and, unless within an exception, is barred by the hearsay rule. *Manuel J. Furtado, Inc.* v. *Sarkas*, 118 R.I. 218, 224, 373 A.2d 169, 172 (1977); *State* v. *Clark*, 112 R.I. 270, 274, 308 A.2d 792, 794-95 (1973); *State* v. *Vaccaro*, 111 R.I. 59, 62, 298 A.2d 788, 790 (1973); *State* v. *White*, 107 R.I. 306, 309-10, 267 A.2d 414, 416 (1970) (quoting 6 Wigmore, *Evidence* (3d ed.) §1766 at 178); Fed. R. Evid. 801(c); McCormick, *supra* §246 at 584. If offered to prove something other than the truth of the matter asserted, however, a statement is not hearsay and the rule does not apply. *Manuel J. Furtado, Inc.* v. *Sarkas*, 118 R.I. at 224-25, 373 A.2d at 172; McCormick, *supra,* §246 at 585; 6 Wigmore, *Evidence* §1766 at 250 (Chadbourn rev. 1976).

Thus the hearsay rule would preclude the use of defendant's statements only if the prosecutor had offered them to prove the truth of the matter asserted - that defendant had twice previously been accused of rape. The record clearly shows that the trial justice did not admit the statements for this purpose. On the contrary, he instructed the jury that they could use defendant's statements only for certain limited purposes. Because the trial justice admitted defendant's statements as evidence of matters other than those asserted therein, we find that they were not hearsay. 6 Wigmore, *supra*, §1766 at 250.

Though the statements are not hearsay, they are not automatically admissible; the purpose for which they were introduced must also have been relevant to an issue in the case. *See* Fed. R. Evid. 402; 6 Wigmore, *supra*, §1766 at 250. The trial justice ruled that defendant's statement to the police was admissible as evidence of his state of mind. The defendant had stated that he could not understand why girls let him make love to them and then scream rape, and that this was the third time he had been accused. This statement clearly manifests defendant's consciousness of guilt, which is incorporated within the term "state of mind." To the extent that the statement evinced consciousness of guilt, it was relevant to whether defendant had raped complainant and was thus properly admissible. We are not convinced, however, that the purpose for which the trial justice admitted defendant's statement to the complainant was relevant to the charges against him.

The trial justice instructed the jurors that he had admitted the statement "only for the fact that the conversation was held in the vehicle." Though the evidence that defendant spoke would certainly be relevant to whether the two had conversed, the conversation itself was not relevant to whether defendant committed any of the crimes charged. The test of relevancy is whether the offered evidence renders a desired inference either more or less probable than it would be without the evidence. Fed. R. Evid. 401; McCormick, *supra*, §185 at 437. The relevant inference to be drawn from

defendant's statement concerned his state of mind - his consciousness of guilt immediately following the crime. The trial court did not admit the statement for this purpose. It admitted the statement solely to show that a conversation had occurred - a matter irrelevant to whether defendant had committed a rape. Accordingly, we find that the trial justice erred in admitting defendant's statement for that purpose.

This error, however, does not require automatic reversal. We must first examine the record to determine the probable impact of this evidence and whether it affected the ultimate outcome of the case. *State* v. *Roderick*, 121 R.I. 896, 900-901, 403 A.2d 1090, 1092 (1979); *State* v. *Bower*, 109 R.I. 198, 203-04, 283 A.2d 39, 41 (1971). If the admission of the evidence "neither distracted the jury's attention from, nor influenced its decision on the ultimate issue of the defendant's guilt," the error in admitting it was harmless. *State* v. *Andrews*, 120 R.I. 771, 779, 390 A.2d 926, 931 (1978).

In this case, we find that the admission of defendant's statement to the complainant as proof that the conversation took place was harmless error. This statement was relevant primarily to whether defendant had raped the complainant. That defendant was acquitted of the rape charge is ample evidence that the admission of the statement was harmless. Even if defendant had not been acquitted, however, there was sufficient independent evidence to minimize the impact on the jury. The complainant testified in great detail about the crime and positively identified defendant at trial. Additionally, the trial justice had properly admitted the nearly identical statement defendant later made to the police. In light of these facts, we find that the admission of defendant's first statement did not influence the jury's decision on defendant's guilt.

Though we find that defendant's out-of-court statements pose no hearsay problems and are relevant to his state of mind, we must now determine whether they should have been excluded as evidence of defendant's prior bad acts. In general, evidence of the bad character of an accused, includ-

ing his prior bad acts, is initially inadmissible as evidence that he committed the crime charged. *State* v. *Jalette,* 119 R.I. 614, 624, 382 A.2d 526, 531-32 (1978); *State* v. *Horton,* 47 R.I. 341, 347, 133 A. 236, 239 (1926); *McCormick, supra,* §190 at 447; 1 Wharton, *Criminal Evidence,* §240 at 528-31 (13th ed. 1972); 1 Wigmore, *supra,* §192 at 641-42. Evidence of an accused's prior criminal acts may not be used because the potential for creating prejudice in the minds of the jurors outweighs its probative value. McCormick, *supra,* §190 at 447; 1 Wharton, *supra,* §240 at 535. "The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character." McCormick, *supra* §190 at 447.

An exception to the above rule allows the use of evidence of an accused's prior bad acts to show his criminal intent. *State* v. *Jalette,* 119 R.I. 614, 624, 382 A.2d 526, 532 (1978); *State* v. *Mazzarella,* 103 R.I. 253, 257, 236 A.2d 446, 449 (1967); *State* v. *Colangelo,* 55 R.I. 170, 173-74, 179 A. 147, 149 (1935); *State* v. *Horton,* 47 R.I. at 347, 133 A. at 239; *see* 1 Wharton, *supra,* §245 at 554-56; 1 Wigmore, *supra,* §192 at 642. This court has stated that if evidence "tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like, [it] is proper" and a court may admit it. *State* v. *Colangelo,* 55 R.I. at 174, 179 A. at 149. In these instances, the probability of prejudice to the accused is outweighted by the state's interest in introducing the evidence. A trial justice, however, should admit this sort of evidence cautiously and should instruct the jury on its limited use. *State* v. *Jalette,* 119 R.I. at 625, 382 A.2d at 532. As we noted in *Jalette,* evidence of other sexual crimes is "uniquely apt to arouse the jury's hostility." For this reason we stated that the prosecutor should introduce evidence of similar sex crimes sparingly and only when reasonably necessary to show one of the traditional exceptions to the general prohibition against the initial use of character evidence. *Id.* at 627, 382 A.2d at 533.

■ The defendant's statements both when he was arrested and when the complainant left him tended to establish his guilty knowledge concerning the rape and were thus properly admissible. *State* v. *Colangelo,* 55 R.I. at 174, 179 A. at 149. The term "state of mind" used by the trial justice encompasses consciousness of guilt, and either may be proved by evidence of the defendant's prior bad acts. *See State* v. *Colangelo,* 55 R.I. at 173-74, 179 A. at 149. We thus find no reversible error in the admission of the defendant's statements that he had twice previously been accused of rape.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.

*Dennis J. Roberts II,* Attorney General, *Alfred French Goldstein,* Special Assistant Attorney General, for plaintiff.

*Barbara Hurst, Mary E. Levesque, Paula Rosin,* Assistant Public Defenders, *Anthony F. Muri,* Amicus Curiae, Rhode Island, Affiliate of the American Civil Liberties Union, for defendant.