**COYOTE et al.**

v.

**Dennis J. ROBERTS, II et al.**

**Civ. A. No. 76–0254.**

United States District Court,
D. Rhode Island.

Dec. 17, 1980.

---

Ralph Gonnella, Providence, R. I., for plaintiffs.

Harold Krause, Sp. Asst. Atty. Gen., for the State of Rhode Island, Providence, R. I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

In this § 1983 action challenging the constitutionality of a Rhode Island criminal statute, plaintiffs seek attorney's fees on the theory that their action was at least partially responsible for recent amendments to the statute which effectively mooted the case.

Plaintiffs are Jane Doe, a prostitute; COYOTE, a national organization of women and men (both prostitutes and nonprostitutes) who seek reform of law prohibiting prostitution and other forms of sexual behavior; and COYOTE of Rhode Island, the local chapter of the national organization. Defendants are the Attorney General of the State of Rhode Island and the Chief of Police of the City of Providence, both in their official capacities. In their complaint filed in July 1976, plaintiffs attacked the validity of R.I.G.L. § 11–34–5, the statute which then prohibited prostitution and the commission of other "lewd and indecent acts."[1] They charged that the overbroad sweep of the statute impermissibly infringed on constitutionally protected rights of privacy and association. They also alleged that the statute was discriminatorily enforced, in that only women were arrested and charged with its violation even though,

---

1. Prior to May 1980, R.I.G.L. § 11-34 5 read: Transportation for indecent purposes—Streetwalking—Harboring prostitution.—It shall be unlawful for any person to secure, direct or transport, or offer to secure, direct or transport another for the purpose of prostitution, or for any other lewd or indecent act; or to loiter in or near any thoroughfare or public or private place for the purpose of inducing, enticing, soliciting, or procuring another to commit lewdness, fornication, unlawful sexual intercourse or any other indecent act; or to commit or in any manner induce, entice, or solicit, or procure a person in any thoroughfare, or public or private place or conveyance to commit any such act; or to receive or offer or agree to receive any person into any place, structure, house, building, room, or conveyance for the purpose of committing any such acts, or knowingly permit any person to remain therein for any such purposes, or to, in any way, aid or abet or participate in any of the acts or things enumerated herein.

Any person found guilty under this section, shall be subject to imprisonment in the adult correctional institutions not to exceed five (5) years.

As discussed *infra* in the text, the phrase "indecent acts" has been broadly construed by the Rhode Island Supreme Court.

on its face, the statute was gender neutral. They prayed for a declaration that R.I.G.L. § 11 -34–5 was unconstitutional both on its face and as applied.

After a lengthy period of discovery and preparation, trial to the Court was held on September 25, 1979. In May 1980, before this Court had rendered a decision on the merits, the Rhode Island legislature amended the challenged statute. At a subsequent conference, all the parties agreed with the Court that the amendments had substantially cured the alleged constitutional infirmities of the statute. In addition, plaintiffs stated that the alleged pattern of discriminatory enforcement on the part of the Providence police force had ceased, or at least substantially diminished, sometime after the commencement of the action. Therefore, on September 22, 1980, an order was entered by consent dismissing the case as moot.[2] That order expressly reserved the question of attorney's fees, and plaintiffs have now timely moved for a fee award pursuant to the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988.

### I. Propriety of a Fee Award Against the State Defendant

As defendant properly concedes, plaintiffs' fee request is not foreclosed by the fact that this case was terminated without an entry of judgment in favor of plaintiffs. "[F]or purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or *without formally obtaining relief.*" S.Rep.No. 94–1011, 94th Cong., 2d sess. 5, *reprinted in* [1976] *U.S. Code Cong. & Ad. News* pp. 5908, 5912 (emphasis added). "Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Maher v. Gagne,* 448 U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (June 25, 1980). *See Chicano Police Officers Ass'n. v. Stover,* 624 F.2d 127, 131 (10th Cir. 1980); *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir. 1978).

The Civil Rights Attorney's Fees Awards Act encourages the vindication of federal rights by alleviating the financial burdens attendant on resort to the judicial process. Federal courts have uniformly recognized that the intent and purpose of § 1988 mandates the award of fees to plaintiffs who have obtained some significant part of the relief they sought without completing the full course of litigation. A judgment entered into by consent or an out-of-court settlement may support a fee award. *E.g., Chicano Police Officers Ass'n v. Stover,* 624 F.2d at 131 (pre-trial settlement); *Gagne v. Maher,* 594 F.2d 336, 338–39 (2d Cir. 1979), *aff'd,* 448 U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). (consent

---

**2.** No damages were sought by plaintiffs for the period of alleged discriminatory enforcement. The Court believed it was therefore inappropriate to continue with that portion of the claim, for any relief granted would have been merely a declaration of historical fact.

The order dismissing the case as moot reads in its entirety:

#### JUDGMENT

Upon the suggestion of the Defendant, Dennis J. Roberts, II, the Court has considered the effect of the passage by the Rhode Island Legislature and approval by the Governor of Rhode Island on May 9, 1980 of an amendment to R.I.G.L. § 11 34 5 which is the subject of the constitutional challenge by plaintiffs herein.

It is the judgment of the Court that the amendment to R.I.G.L. § 11 34 5 has effectively resolved and mooted all of the constitutional issues that plaintiffs were raising herein. Additionally, the practices complained of concerning the Defendant, Ricci and the City of Providence ceased after commencement of this action, and, therefore, are no longer an issue.

Therefore, because this case has become moot, plaintiffs complaint is dismissed.

The question of attorney's fees is specifically reserved and plaintiffs may present a motion to the Court within ten (10) days from the entry of this Judgment for the award of an attorney's fee.

By Order,
s/ Concetta R. Zinni
Deputy Clerk

Consented as to substance
and form and entered by
agreement of counsel:
s/ Raymond J. Pettine
Chief Judge
Sept. 22, 1980

decree); *Nadeau v. Helgemoe,* 581 F.2d at 278–79 (post-appeal consent decree); *Reynolds v. Comey,* 567 F.2d 1166, 1166 (1st Cir. 1978) (pre-trial settlement). This result removes any incentive a plaintiff might otherwise have to hold out for a full trial in order to obtain fees. If a case is mooted by cessation of the complained of practice or alteration of the challenged policy, a ·fee award may likewise be appropriate. *E.g., Morrison v. Ayoob,* 627 F.2d 669, 670–72 (3d Cir. 1980) (per curiam) (challenged behavior ceased after case was filed and plaintiffs' attorney had talked with defendants); *Ross v. Horn,* 598 F.2d 1312, 1314, 1321–22 (3d Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980) (agency regulation amended); *International Society of Krishna Consciousness v. Andersen,* 569 F.2d 1027, 1028 (8th Cir. 1978) (per curiam) (amendment of city ordinance); *Fischer v. Adams,* 572 F.2d 406, 409 (1st Cir. 1978) (after filing of suit, government took action plaintiff sought). *See O'Neill v. DeConti,* 634 F.2d 616 (1st Cir. 1980). If this were not the rule, a defendant could put a plaintiff to the expense of engaging in discovery, pre-trial motions and memoranda, and other preparatory efforts until the strength of the case became clear, and then, by reforming its ways before the court could act on the merits, preclude the plaintiff's recovery of fees for labor that in fact accomplished the desired objective.

The Court has not found a case involving the precise situation here—that is, where a challenged state statute is amended by the legislature after ·trial but before a decision has been rendered. *Cf. International Society of Krishna Consciousness v. Andersen,* 569 F.2d at 1028 (city ordinance amended after parties had submitted stipulation of fact and presented oral argument). Although the circumstances presented by this case may be unprecedented, the policy considerations implicated by plaintiffs' fee request are essentially the same as those involved in any other fee award case. Had plaintiffs accomplished their goals through a decree rendered by this Court on the merits, a fee award against the state defendant in his official capacity would clear-

ly have been appropriate. *See Hutto v. Finney,* 437 U.S. 678, 693–700, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978); *Williams v. Alioto,* 625 F.2d 845, 848 (9th Cir. 1980). It seems no less appropriate if there has been a change in the questioned statute that was proximately caused by plaintiffs' suit and that achieved, in a substantial measure, the benefits they sought. For purposes of determining entitlement to a fee award, there should be no difference between inducing the modification of individual behavior or private policy and effecting the modification of official behavior or public policy.

■ The Court therefore concludes that if plaintiffs have achieved some substantial part of the benefit they sought, and if they otherwise meet the criteria for a "prevailing party" discussed below, they are entitled to a fee award even though the change in Rhode Island law came about without formal judicial involvement.

*Benefit Accruing to Plaintiffs by Amendment of R.I.G.L. § 11–34–5*

■ In order to recover attorney's fees in the absence of a clearcut judgment in their favor, plaintiffs must show that the basic objectives they sought from the lawsuit have been achieved, or at least furthered in some significant way. *Chicano Police Officers Ass'n v. Stover,* 624 F.2d at 131. They need not have accomplished *all* their goals. Partial success is sufficient so long as it involves some significant issue in the litigation. *Nadeau v. Helgemoe,* 581 F.2d at 278–79. *See Ross v. Horn,* 598 F.2d at 1322.

In opposing plaintiffs' fee request, defendant argues that no benefit actually accrued to Jane Doe and COYOTE from the amendment of R.I.G.L. § 11–34–5. The first step in determining whether plaintiffs have benefited from the statutory change is to identify precisely the legal and factual conditions that prompted their suit. *Bonnes v. Long,* 599 F.2d 1316, 1319 (4th Cir. 1979). These conditions serve as the benchmark against which subsequent developments are measured and evaluated. Here, the prior version of R.I.G.L. § 11–

34–5 was a farreaching interdiction of all unlawful sexual conduct. It made felonious the commission of any "indecent act"—a phrase which the Rhode Island Supreme Court had construed to encompass all extramarital sexual intercourse as well as "unnatural" forms of copulation regardless of the marital status of the participants. *See State v. Santos*, R.I., 413 A.2d 58, 64–66 (1980); *State v. Milne*, 95 R.I. 315, 321–24, 187 A.2d 136, 139–41 (1962), *appeal dismissed for want of substantial federal question*, 373 U.S. 542, 83 S.Ct. 1539, 10 L.Ed.2d 687 (1963). Criminal sanctions could be imposed without regard to whether the sexual activity was a commercial venture undertaken for financial gain, or whether the activity was undertaken in private with the full consent of two adult parties. In addition to prohibiting the commission *per se* of any "indecent act", the statute banned certain preliminary or preparatory activities. Securing, transporting, loitering to solicit, receiving into a structure or conveyance, and aiding and abetting a person for the purpose of committing the prohibited acts were felonious, again without regard to the publicness of the activity, the mutuality of consent, or the financial motivation of either participant.

Asserting that "the constitutional right of privacy must necessarily include the decision of individuals, married or single, to engage in private consensual sexual relations," plaintiffs' emphasis throughout the case was on the allegedly protected nature of the sexual act itself. While insisting that the constitutional protection of private sexual activity did not dissipate once the element of financial remuneration was introduced, plaintiffs readily conceded the State's power to regulate and even criminalize the public facets of prostitution. The following passage from their post-trial memorandum typifies plaintiffs' position throughout the case:

> The crux of plaintiff's constitutional claim is that R.I.G.L. § 11–34–5 sweeps too broadly in that it unconstitutionally punishes private consensual conduct between adults and *private* solicitation, as well as other forms of conduct, i. e. public solicitation, which may properly be the subject of government prohibition or regulations.

Memorandum, p. 8 (footnote omitted).

The May 1980 amendments to Chapter 11–34 of the General Laws were both substantive and procedural. The prohibition against loitering to solicit or procure another for prostitution or "any other indecent act" was deleted from § 11–34–5. This conduct now constitutes a petty misdemeanor covered by new § 11–34–8. Another new section denies a jury trial to defendants charged with such behavior and creates a truncated procedure for appeal of § 11–34–8 convictions. The phrase "for pecuniary gain" was added to § 11–34–5 and the prohibition against *committing* the act of prostitution[3] or any other "indecent act" was deleted.[4]

---

3. As used in this opinion, the phrase "act of prostitution" refers to the commission of the sexual act itself for remuneration. It does not include any of the preliminary or preparatory activities, such as solicitation or negotiation.

4. The effect of the May 1980 amendments was as follows: (underlined phrases were added; scored phrases were deleted):

Transportation for indecent purposes— Streetwalking—Harboring prostitution.—It shall be unlawful for any person, for pecuniary gain, to secure, direct or transport, or offer to secure, direct or transport another for the purpose of prostitution, or for any other lewd or indecent act; or to loiter in or near any thoroughfare or public or private place for the purpose of inducing, enticing, soliciting, or procuring another to commit lewdness, fornication unlawful sexual intercourse or any other indecent act, or to commit or in any manner induce, entice, or solicit, or procure a person in any thoroughfare, or public or private place or conveyance to commit any such act; or to receive or offer or agree to receive any person into any place, structure, house, building, room, or conveyance for the purpose of committing any such acts, or knowingly permit any person to remain therein for any such purposes, or to, in any way, aid or abet or participate in any of the acts or things enumerated herein.

Any person found guilty under this section, shall be subject to imprisonment in the adult correctional institutions not to exceed five (5) years.

Although the full import of the addition of "for pecuniary gain" is not clear, it seems evident that the statute is now directed at suppressing specifically that type of sexual activity commonly regarded as "prostitution".[5] More significant for present purposes, the amendments appear to have decriminalized the sexual act itself, even when undertaken for remuneration. Thus, it appears to the Court that § 11–34–5 now outlaws only certain preliminary or preparatory activities (securing, transporting, receiving into a house or conveyance, etc.), and then only when pecuniary gain is somehow involved.

The core of plaintiffs' claim was that the State could not constitutionally bar consenting adults from engaging in purely private sexual activity, irrespective of whether the motivation of one of the participants was economic. As the Court reads the statutes, neither the amended version of § 11–34–5 nor the new § 11–34–8 purport to outlaw such activity.[6] It would seem, then, that the May 1980 amendments afforded plaintiffs a very substantial portion of the relief they sought through litigation. Defendant's objection appears to be that because many (if not most) of the plaintiffs are prostitutes, and because law enforcement personnel will continue to arrest and prosecute prostitutes under the new statutes,

plaintiffs haven't in reality gained anything. Of course, this argument ignores the fact that the old statute encompassed far more than sex-for-pay. Removal of the clause prohibiting the *commission* of "indecent acts" benefits any of the plaintiffs—whether prostitutes or not—who wish to engage in nonremunerative sexual activity of the type barred by the prior version of § 11–34–5.

As for the issue of prostitution itself, defendant's argument presents a more difficult question. His point is well taken that plaintiffs may find it difficult to engage in the now decriminalized act of prostitution with impunity because all the preparatory activity remains felonious. Nevertheless, plaintiffs have at all times conceded the State's ability to regulate public aspects of prostitution. They have litigated this case in the belief that decriminalization of the act of prostitution, regardless of the continued vitality of anti-solicitation laws, furthers their campaign to insulate private, adult consensual sexual activity from state control. Doubtless, they would have been happier had *privately* conducted preliminary activity been exempted from the criminal sanctions of § 11–34–5. Yet, their consent to the order dismissing this case as moot indicates that they did not consider the point to be of any great importance.[7]

---

New § 11 34 8 reads:
 Loitering for indecent purposes—It shall be unlawful for any person to stand or wander in or near any public highway or street, or any public or private place, and attempt to engage passersby in conversation, or stop or attempt to stop motor vehicles, for the purpose of prostitution or other indecent act, or to patronize or induce or otherwise secure a person to commit any such act. Any person found guilty under this section, shall be deemed guilty of a petty misdemeanor and shall be subject to imprisonment for a term not exceeding six (6) months or by a fine of not more than five hundred dollars ($500), or both.

5. The Court uses the phrase "*commonly regarded* as prostitution" because there has been considerable discussion at trial and in the plaintiffs' memoranda about what prostitution really means, and about whether it is possible to separate the case of sex-for-pay from the case where the "profit" derived from granting sexual favors is equally tangible but less explicit.

6. The Attorney General apparently has no quarrel with the Court's view of the import of the May 1980 amendments. His post-trial memorandum, which first raised the question of mootness, argues: "Insofar as the amended statute no longer prohibits private consensual sexual activity between adults, plaintiffs' case would appear to be moot."

7. At various points in the case, plaintiffs did allude to the possibility of ancillary constitutional protection for the purely private pursuit of such preliminary activities as solicitation. *Cf. Carey v. Population Services*, 431 U.S. 678, 688, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977). This has by no means, however, been a dominant strain in their argument. In their post-trial memorandum, submitted before the mootness question was raised, they stated:
 The parameters of the state's power to constitutionally regulate and control as to time, place and manner and other substantive restrictions are not an issue in this case and the Court need not address these questions. The

Thus, defendant's argument is essentially this: Regardless of whether plaintiffs have obtained a substantial part of what they sought through litigation, and despite their apparent satisfaction with the current situation, the Court must decide if they have "really" benefited from getting what they wanted.

In evaluating this argument, the Court has found little guidance in cases from this, or other, circuits. It is well-established that even when a plaintiff obtains in large part the object of her suit, a court must independently assess the substantiality of her claim to ensure that she has prevailed in a *legal* sense. *See infra.* Whether a plaintiff who believes that she has achieved something of value must also satisfy an objective test of benefit in a *factual* sense is not at all clear. To some extent, the law does attempt independently to appraise the degree of real advantage that accrues to a plaintiff from a lawsuit. The doctrine of standing and principles of justiciability that weed out hypothetical questions establish a minimum quantum of objectively-defined benefit that a suit must offer; the sincerest subjective expectation of advantage will not avail the plaintiff who cannot meet those standards. Those criteria ensure that a suit will possess a certain degree of legally-cognizable value to the litigant. Once they have been satisfied, the Court does not know by what more rigorous scale it could purport to gauge the "real" worth of a plaintiff's getting substantially what she wanted. Nor am I sure that a court's judgment of what is worth fighting for should be substituted for that of the litigant who saw fit to institute and prosecute the suit. Therefore, absent a clear indication from a higher court that a different test is required, this Court concludes that the extent of actual benefit to plaintiffs is to be measured by the degree to which defendant's subsequent actions afforded them the relief they sought. Here, as defendant agrees, the statutory amendments satisfied plaintiffs' principal objection to § 11–34–5. The Court therefore finds that the requisite benefit-in-fact exists in this case.

### Criteria for "Prevailing Party"

Having concluded that plaintiffs benefited from the statutory amendments, this Court must determine whether they meet the two-prong test for "prevailing party" established by the First Circuit in *Nadeau v. Helgemoe*, 581 F.2d 275 (1978). No award may be made if the Court finds that plaintiffs' action was "completely superfluous" in bringing about the change. Rather, their efforts must have been a "necessary and important factor in achieving the improvements." *Id.* at 281. This is a question of fact which, as discussed further below, requires an evidentiary hearing for its resolution. In addition, the Court must determine whether plaintiffs have "prevailed in a legal sense". A fee award is not appropriate if the claims are so "frivolous, unreasonable, or groundless" that defendant's conduct must be presumed to have been gratuitous. *Id.* Cf. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).

The process of evaluating the substantiality of a claim for purposes of § 1988 is not to be equated with ruling on the sufficiency of the claim for purposes of a Rule 12(b)(6) motion to dismiss. Delving too deeply into the actual merits of the claim could enmesh a court in the very trial that extra-judicial resolution of the case had rendered unnecessary. More important—and more relevant here, given that a trial has already been held—it would mean

---

only question that this Court need decide is whether a state may constitutionally prohibit all aspects and *in toto* private consensual sexual relations between unmarried adults. As indicated by the section of defendant's memorandum quoted in the preceding footnote, defendant also understood plaintiffs' primary concern to be the prohibition of adult consensual sexual activity *per se.* He agreed that the statutory amendments had satisfied that concern. This is not a situation, then, where a plaintiff, sensing imminent defeat on the merits, attempts to bail out of a case (recovering fees in the process) by pointing to some relatively insignificant change in the challenged behavior or policy.

deciding constitutional issues no longer presented by the factual context of the case. *See Dawson v. Pastrick*, 600 F.2d 70, 78 (7th Cir. 1979); *Gagne v. Maher*, 594 F.2d at 340, 336 (2d Cir. 1979), *aff'd.* 448 U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). Rather, the § 1988 inquiry is more akin to the threshold evaluation of whether a purported constitutional claim is substantial enough to confer subject matter jurisdiction on the federal court. *See generally Hagans v. Lavine*, 415 U.S. 528, 536–43, 94 S.Ct. 1372, 1378, 39 L.Ed.2d 577 (1974); *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). *Cf. Maher v. Gagne*, 448 U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). Of course, affording fees to plaintiffs who engage in strike suits or prevail through nuisance settlements is to be avoided. However, the fact that the court might have ultimately rejected all or part of the plaintiff's claim does not bar a fee award so long as the claim has at least colorable merit when analyzed in light of established constitutional theory. *See Nadeau v. Helgemoe*, 581 F.2d at 281.

 Prior to May 1980, R.I.G.L. § 11–34–5, as construed by the Rhode Island Supreme Court, purported to outlaw all extramarital sexual intercourse, and all "unnatural" methods of copulation regardless of whether the participants were married. Thus, the prohibition against prostitution was but one segment in a broad scheme of regulation of sexual behavior. The State's power to prohibit particular types of sexual conduct between married persons is extremely questionable after *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1081, 14 L.Ed.2d 510 (1965). Its power to discriminate between married and unmarried adults, at least with regard to "natural"

forms of copulation, is open to debate in light of such cases as *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 921, 28 L.Ed.2d 213 (1972) and *Carey v. Population Services*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (plurality opinion). *See State v. Saunders*, 75 N.J. 200, 381 A.2d 333 (1977) (fornication statute unconstitutional). *Cf. Commonwealth v. Balthazar*, 366 Mass. 298, 318 N.E.2d 478 (1974) (sexual offense statute construed not to reach private consensual acts). The prohibition of "unnatural" forms of intercourse by unmarried persons was perhaps the least vulnerable part of the statute, for the Supreme Court has twice summarily refused to disturb convictions of unmarried persons who engaged in such acts. *See Poe v. North Carolina*, 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980), *dismissing, for want of substantial federal question, appeal from* 40 N.C.App. 385, 252 S.E.2d 843 (1979); *Doe v. Commonwealth's Attorney*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), *summarily aff'g* 403 F.Supp. 1199 (E.D.Va.1975). *But see Commonwealth v. Bonadio*, —— Pa. ——, 415 A.2d 47 (1980) (invalidating voluntary deviate sexual intercourse statute). Such summary dispositions are binding on the lower courts as rulings on the merits; they do not, however, have the same precedential weight as a full opinion. *Illinois State Board of Education v. Socialist Workers Party*, 440 U.S. 173, 180–81, 99 S.Ct. 983, 986, 59 L.Ed.2d 230 (1979); *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam). Finally, with respect to prostitution itself, the effect that financial motivation has on the status of an activity that might otherwise merit constitutional protection is an uncertain and difficult question.[8] *Cf. Virginia State*

---

8. Neither party has produced, nor has the Court independently found, any binding precedent on the constitutionality of a statute prohibiting the act of prostitution when committed in private by consenting adults. In *United States v. Coran*, 589 F.2d 70 (1978), the First Circuit refused to consider whether Maine's prostitution statute impermissibly interfered with protected privacy rights on the grounds that appellants, who had not conducted their activities "with any pretensions to privacy",

had no standing to raise the question. *Id.* at 73 74.

Nor can the Supreme Court's dismissal of *State v. Milne*, 95 R.I. 315, 178 A.2d 136 (1962) for want of a substantial federal question be deemed controlling. In the first place, *Milne* occurred prior to the series of cases that recognized some form of constitutionally protected right to privacy in sexual matters. More important, *Milne* involved a vagueness challenge to the statutory phrase "independent acts." The

*Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761, 96 S.Ct. 1817, 1824, 48 L.Ed.2d 346 (1976).

■ In sum, it cannot be said that plaintiffs' challenge to the alleged overbreadth of R.I.G.L. § 11–34–5 was patently frivolous or unreasonable. The Court therefore concludes that their claim was sufficiently substantial to meet the standard required of a "prevailing party".

The remaining question is one of causation. "[P]laintiffs' conduct, as a practical matter, must have played a significant role in achieving the objective. . . . This causation can be the initial catalyst in producing action, or can be the constant prodding that motivates a defendant to go further than it otherwise would have." *Chicano Police Officers Ass'n v. Stover*, 624 F.2d at 131. The chronological sequence of events is persuasive, although not decisive, circumstantial evidence that the plaintiff's lawsuit was a material factor prompting the defendant's actions. *Morrison v. Ayoob*, 627 F.2d at 672; *Ross v. Horn*, 598 F.2d at 1322; *Nadeau v. Helgemoe*, 581 F.2d at 281.

■ Relying on affidavits from the drafter of the statutory amendments and the Legal Counsel for the Judiciary Committee, and on several contemporaneous newspaper articles, defendant argues that the legislature's actions in May 1980 were a response to angry community outcry against the high incidence of prostitution in the West End of Providence. According to defendant, the amendments were designed to streamline the prosecution process, in the hope that speedier convictions would stem the increase in solicitation and pandering

that outraged neighborhood residents. This explanation plausibly accounts for the new sections making loitering and solicitation petty misdemeanors that are tried to the court and subject to a truncated appeals procedure. It does not, however, shed any light on why phrases outlawing the *commission* of acts of prostitution and other indecent acts were deleted from § 11–34–5.

It is obvious to the Court that the subtle workings of causation in this case cannot be discerned through the media of legal memoranda and affidavits. An evidentiary hearing, with its opportunity for direct observation of witnesses and cross-examination, is required and will be ordered.

■ One final point must be addressed. Defendant Attorney General argues that, whatever the motivation for the statutory amendments, the actions of the legislature were independent of his control and should not be imputed to him. In other words, he contends that fees cannot be assessed against a defendant on the basis of actions taken by a third party, no matter how beneficial they may have been to the plaintiff. Although this contention appears unexceptionable as a principle of law, the Court does not agree that it is applicable here.

To obtain judicial review of the constitutionality of a state statute, plaintiffs used the appropriate device of suing a responsible state official in his official capacity.[9] Cf. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The real target of their suit was the State, which was exercising its police power through the challenged statute. As there was not the slightest hint

---

Rhode Island Supreme Court held that that portion of § 11 34 5 was not so indefinite as to violate due process. Such a holding obviously does not foreclose consideration of a claim that the statute sweeps too broadly and invades protected privacy interests.

The Rhode Island Supreme Court has recently upheld the prior version of § 11–34–5 as against a constitutional attack much like that made here. *See State v. Santos*, R.I., 413 A.2d 58 (1980). Similarly, the Eighth Circuit, relying on *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), has sustained the Missouri prostitution statute. *See*

*J.B.K. Inc. v. Caron*, 600 F.2d 710 (1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645. Those cases, while deserving the careful consideration of this Court, are not, of course, binding on it.

**9.** That Attorney General Roberts is sued in his official capacity seems indisputable in view of the fact that the complaint originally named Julius C. Michaelson, Attorney General in 1976 when this case was filed. Roberts was substituted as defendant after his succession to the office.

of bad faith on the part of the Attorney General such as would justify the imposition of fee liability against him personally, any award of attorney's fees in this case would be assessed against official funds. *Hutto v. Finney*, 437 U.S. at 699–700, 98 S.Ct. at 2565, 2578; *Williams v. Alioto*, 625 F.2d at 848–49.

Once it is recognized that the Attorney General's role in this case is to serve as a surrogate for the State of Rhode Island, the tenor of his position alters somewhat. In substance, he is arguing that it is improper to award fees against the Executive branch of the State on the basis of activity that was really within the bailiwick of the Legislative branch. This Court declines to adopt so rigidly compartmentalized an approach to state governmental action. It is, of course, one of the elementary principles of grade school civics that the Legislature makes the law and the Executive enforces it. However, to the individual subjected to coercive action because his or her behavior violates a statutory command, nice distinctions between *establishing* the law and *executing* the law disappear. Whether manifested through the enactment of a criminal statute or through its enforcement, the State's police power is unitary. The State in its role as law enforcer cannot disavow all connection with the State in its role as law maker.[10]

This Court therefore concludes that there is no legal bar to plaintiffs' recovery of at least a portion of their attorney's fees from the State defendant in his official capacity if they establish the necessary factual basis —i. e., causation—at a subsequent hearing.

## II. *Propriety of a Fee Award Against the City Defendant*

Plaintiffs' complaint charged the City of Providence Police Department with engaging in an intentional and purposeful practice of enforcing R.I.G.L. § 11–34–5 almost exclusively against women. The substance of this claim was not that the police were concentrating on female, as opposed to male, prostitutes. Rather, plaintiffs charged that enforcement efforts were geared towards the predominantly female *sellers* of sexual services while the predominantly male *purchasers* were ignored—even though under the statute the buyer was equally culpable. They further alleged that this enforcement strategy was rooted in sexist and stereotypic beliefs that the woman who engages in prostitution is "deviant" whereas the man who purchases her services is just a "normal" male. Plaintiffs' evidence was primarily statistical, detailing the numbers of males and females arrested and charged under § 11–34–5 between 1974 and 1977, as well as the number of male and female undercover officers assigned to make prostitution arrests during that period.

An equal protection claim of discriminatory enforcement requires some showing of intent or purpose to discriminate. *Washington v. Davis*, 426 U.S. 229, 241–42, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Plaintiffs offered a two–part argument that such intent was present in the Providence Police Department between 1974 and 1977. Noting that *Washington v. Davis* leaves open the possibility that a glaringly disparate impact may support an inference of intentional discrimination, *see Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 264–68, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977), plaintiffs contended that such a disparity existed in this case. Defendant's answers to interrogatories revealed that, during those years, 846 women were arrested under either § 11–34–5 or § 11–45–1 (prohibiting "lewd, wanton or lascivious" behavior); all 846 were charged with prostitution. In the same period, 251 males were arrested. There is dispute as to whether more than 3 of these males were

---

**10.** In support of its position, defendant cites *Dean v. Gladney*, 621 F.2d 1331, 1337-78 (5th Cir. 1980). With respect, this Court does not see the relevance of that case, in which the Fifth Circuit agreed with the lower court that fees should not be assessed against parties who had been dismissed from the case before trial because they were not, as a matter of law, liable to the plaintiff.

actually charged.[11] Even more damning, according to plaintiffs, was the Police Department's admission that it used a total of 55 male undercover officers for prostitution investigations during the 1974–77 period, while employing no female undercover officers in 1974–75 and only four female officers in both 1976 and 1977. Plaintiff asserted that this strategy revealed a conscious choice to enforce § 11–34–5 primarily against women.[12]

Nothing in this precis of plaintiffs' evidence is meant to imply any opinion about the ultimate merit of their discriminatory enforcement claim. As prior discussion has emphasized, this Court need not determine whether plaintiffs were likely to have succeeded in this portion of their case. Plaintiffs must only establish that their claim was not "frivolous, unreasonable, or groundless." Considering the above evidence, and in light of the Police Department's failure to offer an explanation for its enforcement strategy refuting that advanced by plaintiffs, the Court believes that the requisite legal substantiality is present.

It was not unreasonable to assert that the Department's use of a predominantly male undercover force revealed a design to ferret out the women who violated § 11–34–5 while ignoring the equally guilty men. It was not frivolous to argue that discriminatory intent can be implied from the facts that four times as many women as men were arrested, and possibly eight times as many were charged with violating § 11–34–5 during the pertinent time period. This Court is not suggesting that there might not be equally plausible, nondiscriminatory reasons for the Department's prac-

---

11. No firm statistics on the number of males charged were adduced in this case. Plaintiffs' interrogatories inexplicably failed to ask for the prosecution figures for men as well as for women. In moving for summary judgment, defendant Police Chief presented an affidavit of Narcotics Inspector Malcolm Brown, who stated that over 200 males were arrested by the Providence Police for § 11–34–5 violations in the years 1974 77, and that three of these males were charged in 1977. Standing alone, this statement does not, of course, require the conclusion that *only* three men were charged throughout the period. Nevertheless, defendant Police Chief did offer only these figures in support of his motion and argued that plaintiffs' claim of discriminatory enforcement could not stand because "at least three (3) males were arrested and charged for violation of R.I. G.L. 11–34–5." Plaintiffs responded, in substance, that the Police Chief would not have relied on so slender a reed if more substantial support for his position had in fact been available.

The only evidence offered by defendants at trial was the affidavit of a keeper of the records at the State-wide Judicial Information System. This affidavit stated, *inter alia*, that 48 males had been indicted or had criminal informations returned against them in Providence County for § 11 34 5 violations. The affidavit did not indicate what time span this statistic represented. According to the Attorney General's memorandum, the figure covered the period from 1968 to February, 1979. Since the affidavit included no breakdown of these 48 prosecutions by year, it is impossible to determine how many occurred after plaintiffs' suit was filed or in the pertinent 1974–77 period.

12. Plaintiffs reasoned:

> Arrests and charges brought under the solicitation prohibition of § 11 34 5 are mainly derived from the use of undercover police officers who feign being potential customers to unsuspecting males or females. Once the solicitation occurs the arrest is made. It is rare that an arrest occurs pursuant to a complaint made by an actual customer since the sexual activity is for the most part consensual and the person making the report would be admitting to the commission of a crime happening. Thus if the police wish to ferret out the female who is soliciting males to commit unlawful sexual intercourse then they simply use a male undercover police officer as their decoy. Conversely, if the police wish to ferret out the male who is seeking out a female to solicit, they would, of course, employ a female undercover police officer as the decoy. It is clear from an understanding of how arrests and prosecutions are effectuated under § 11 34 5 that there is a direct relationship between the number of males or females arrested and charged under § 11 34 5 and the number of male and female undercover police officers being employed by the Providence Police Department. It is also clear from this *modus operandi* that the police make a conscious choice whether to seek the arrests of males or females under § 11 34 5.

Memorandum, pp. 25 26.

Defendant Police Chief offered no evidence disputing the accuracy of this explanation of prostitution investigation procedures.

tices during this period. It is enough for present purposes that plaintiffs' explanation cannot be dismissed out of hand as contrived or obviously without merit.

Defendant contends that subsequent changes in the Department's enforcement strategy—if any—are traceable to "changing patterns and types of crime" and the "growing awareness" of the West End neighborhood to prostitution, with "the attendant outcry." Plaintiffs contend that the Police Department began using female undercover officers and charging men with § 11–34–5 violations in response to the filing of their lawsuit. This dispute as to causation is properly the subject of a hearing, where the internal workings and policymaking of the Police Department can be probed.

Finally, defendant Chief of Police argues that a fee award is inappropriate because "it can hardly be claimed that the interest of the public is in protecting and legitimizing prostitution." Memorandum, p. 3. This argument ignores the fact that the gravamen of plaintiffs' complaint against the Police Department was sex discrimination. Without commenting on the implication that the substantial constitutional issues presented by plaintiffs' challenge to the original version of § 11–34–5 are less worthy of attention than are other constitutional issues, the Court assumes that defendant is not suggesting that a charge of gender-based discrimination is less meritorious when made by avowed prostitutes than by other women.[13]

 The Court concludes that there is no legal bar to plaintiffs' recovery of fees from defendant Chief of Police in his official capacity if evidence adduced at a subsequent hearing reveals a causal connection between the lawsuit and a change in the Providence Police Department's patterns of enforcing § 11–34–5.[14]

It is hereby ordered that this case be added to the trial calendar and set down for hearing in due course.

So ordered.

---

**13.** Defendant's citation of *Naprstek v. City of Norwich*, 433 F.Supp. 1369 (N.D.N.Y.1977) as support of its argument is not persuasive. In the first place, as the First Circuit has pointed out, *Naprstek* involved "an antiquated and rarely enforced statute" and an attack "more contrived than real". Moreover, the plaintiffs there "had refused early in the lawsuit to negotiate a settlement to bring the offending statute into compliance with constitutional standards." *Nadeau v. Helgemoe*, 581 F.2d at 279 n.3. There is no dispute that R.I.G.L. § 11–34–5 is very much alive and that enforcement of the statute is proceeding against prostitutes and other violators. *E. g., State v. Santos*, R.I., 413 A.2d 58 (1980) (anal intercourse, apparently nonconsensual).
Even were *Narpstek* not factually distinguishable, this Court finds the approach of Judge Gordon in *Harris v. Harvey*, 453 F.Supp. 886, 888 (E.D.Wis.1978) more compatible with the purpose of § 1988.

**14.** The Court wishes to emphasize that it is not expressing *any opinion* on whether there has in fact been a change in the enforcement of R.I. G.L. § 11–34 5. Unlike the State's action in amending the statute, any action by the Providence police in altering their investigation strategy would not be so self-evident that the Court could take judicial notice of its occurrence. Whether an appreciable change in enforcement patterns has indeed taken place since the filing of plaintiffs' complaint is one of the issues that will have to be resolved through the evidentiary hearing.